IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

IN THE MATTER OF THE SEARCH OF

ELECTRONIC DEVICES SEIZED FROM
200 GENERAL CLEBURNE DRIVE,
RICHMOND, KENTUCKY 40475
BELONGING TO KYLE JAY KNEZEVICH
AND FURTHER DESCRIBED IN
ATTACHMENT A

--CURRENTLY LOCATED AT KENTUCKY
STATE POLICE ELECTRONIC CRIMES
BRANCH EASTERN KENTUCKY
UNIVERSITY CAMPUS, 529 LANCASTER
AVENUE, MEMORIAL SCIENCE
BUILDING, ROOM 184, RICHMOND,
KENTUCKY 40475

Case No. ____5:23-mj-5324____

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

1.      I, SA Kimberly Hill Kidd, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

2.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

3.      I am a Special Agent with the FBI and have been since February 2002.  As such, I am a federal law enforcement officer authorized to investigate violations of federal law and to

apply for and execute warrants issued under the authority of the United States.  I investigate various federal crimes, including those involving child pornography and child exploitation. Before becoming a Special Agent, I was a Psychological Associate for a private counseling practice for seven years, where I specialized in providing counseling to preteen and teenage girls. I have extensive law enforcement training in child exploitation crimes, and most of my caseload consists of child exploitation crimes involving the internet and computer equipment.  I have attended numerous in-services, trainings, and have completed on-line training in relation to computer crimes against children and computer crimes in general.

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all knowledge about this matter. I have set forth only the facts that I believe are necessary for the limited purpose of establishing probable cause to conduct a search of and for the items described in Attachments A and B for evidence, contraband, and/or instrumentalities of the criminal conduct described herein. Additionally, unless otherwise indicated, wherever in this Affidavit I assert that an individual made a statement, that statement is described in substance herein and is not intended to be a verbatim recitation of such statement. Furthermore, unless otherwise indicated, all statements contained in this Affidavit are summaries in substance and in part.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

5.     The property to be searched includes the following items, hereinafter collectively referred to as the "Devices":

  a.   47 DVD's / CD's;

2

     b.   iPad 8th Generation, Serial Number H98FRCSVQ1GG, in a black unicorn case;

     c.   iPhone XR, Serial Number DNPXT0E2KXKWN, in black brpro case;

     d.   Dell Latitude 5430, EKU Service Tag 4PN7LR3;

     e.   External Hard Drive, Serial Number 2HCJ0950, black in color;

     f.   Simple Tech Hard Drive, Model Number 96300-40001-001, Grey;

     g.   Seagate Backup Plus Portable Drive, Serial Number NA5CQW9T, black;

     h.   MSI Gaming Series, Serial Number GS702PE212USK1407000380;

     i.   White/Yellow Lexar Flash Drive;

     j.   Black Data Stick Pro Flash Drive; and

     k.   Brave 6 Plus Akaso Camera with Stand.

The Devices were seized from the residence of Kyle Jay Knezevich, located at 200 General Cleburne Drive, Richmond Kentucky, 40475, and are currently located at the Electronic Crimes Branch EKU Campus, located at 529 Lancaster Avenue, Memorial Science Building, Room 184, Richmond, Kentucky 40475. Each of the Devices was manufactured outside of Kentucky.

6.    The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data described in Attachment B.

## STATUTORY AUTHORITY

7.    This investigation concerns alleged violations of Title 18, United States Code, §§ 2251 and 2252, relating to material involving the sexual exploitation of minors:

     a.   18 U.S.C. § 2251(a) prohibits a person from attempting to employ, use, persuade, induce, entice, or coerce any minor to engage in, or to have a minor assist any other person to engage in, or to transport any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in any

3

sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct.

        b.     18 U.S.C. §2252(a)(4)(B) prohibits a person from knowingly possessing or knowingly accessing with intent to view any material that contains a visual depiction of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct, that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

8.    The following definitions apply to this Affidavit and its Attachments:

a.    The term "child pornography," as defined in 18 U.S.C. § 2256(8), means any visual depiction, including any photograph, film, video, picture, or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct. This is also referred to as child sexual abuse material.

b.    "Child sexual abuse material" or "CSAM" as used herein, refers to child pornography, as defined by 18 U.S.C. § 2256(8). The FBI refers to child pornography as "child sexual abuse material" or "child exploitation material" because these terms most accurately reflect the sexual abuse and exploitation experienced by child victims.

c.    The term "minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years. At times, this affidavit and its attachments may also refer to a minor or minors as "child" or "children," respectively.

d.    The term "sexually explicit conduct," 18 U.S.C. § 2256(2)(A)(i-v), is defined as actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic areas of any person.

e.  The term "visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

f.  The term "computer," as defined in 18 U.S.C. §1030(e)(1), means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

g.  "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

h.  "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

i.  "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

j.  "Computer passwords, pass-phrases and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password or passphrase (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may

5

include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

k.  "Digital camera" can be a standalone camera or be embedded into a smartphone. This device records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

l.  "iCloud" iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com.  iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers.  iCloud Drive can be used to store presentations, spreadsheets, and other documents.  iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices.  iCloud Backup allows users to create a backup of their device data.  iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations.  iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

m.  The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means. Because this search warrant application relates to a smartphone, such records, documents, and materials should primarily refer to electronic information or data on the Devices or any associated storage mediums.

n.  "Smartphone" means a combination of a mobile phone / cellphone and a handheld computer that works off mobile networks and/or Wi-Fi, or a wireless connection.

6

A smartphone can do everything a personal computer can do, and because of its mobility, sometimes more. A smartphone is a mobile phone with highly advanced features. A typical smartphone has a high-resolution touch screen display, Wi-Fi connectivity, Web browsing capabilities, and the ability to accept sophisticated applications. Most of these devices run on two popular mobile operating systems, Android or iOS. Almost all smartphones now run on processors with high processing speeds coupled with low power consumptions. That means they allow you to play games, browse the Web, update your social media accounts (i.e., Facebook, Instagram, Twitter), make phone calls, send/receive text messages, take pictures, make videos, and even compose word documents directly on the device. A smartphone is always generally with reach. Like with a traditional computer, smartphones have the ability to download and run hundreds of thousands of mobile applications.

o.   "Tablet" means a mobile computer, typically larger than a phone yet smaller than a notebook, which is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending, and receiving e-mail, and participating in Internet social networks.

p.   "Electronic storage medium," as used herein, refers to any item capable of electronic storage, including but not limited to computers, computer hardware, digital cameras, mobile devices, CDs, DVDs, SD cards, memory sticks, etc.

### CHARACTERISTICS COMMON TO INDIVIDUALS WHO PRODUCE, RECEIVE, OR POSSESS CSAM

9.     Based on my previous investigative experience related to child sexual abuse material investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who produce, receive, distribute, or possess child pornography or use the internet or Social Networking Sites to entice or coerce minors to provide child sexual abuse material, or who place

themselves in positions of trust or teaching to gain access to children for the purposes of

grooming or enticing those minors into engaging in sexually explicit activities:

        a.      Individuals who receive or produce child sexual abuse material may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

        b.      Individuals who receive or produce child sexual abuse material may collect sexually explicit or suggestive materials, in a variety of media, including photographs, digital images and videos, magazines, motion pictures, books, and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts or to refresh their memories of prior sexual child abuse activities they have committed.

        c.      Individuals who receive or produce child sexual abuse material almost always possess and maintain their original copies of child pornographic material, that is, their pictures and videos in the privacy and security of their home, person, vehicle, workplace, or some other secure, web-based or cloud-based, location. Individuals who have a sexual interest in children or images of children typically retain pictures, videos, films, photographs, magazines, correspondence, books, mailing lists, and child erotica for many years. Many of these collections can be found on external media storage devices that are easily concealed in the home, a vehicle, or the workplace, away from family members or co-workers who could stumble upon the collection. The collections may also be concealed on smartphones in hidden applications or albums, or concealed on external storage devices.

        d.      Likewise, individuals who receive or produce child sexual abuse material often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer, web-based program, cloud-based program, or secure third-party application on a mobile device or computer. These collections are often maintained for several years and are kept close by. Physically they can be kept at the collector's residence, a storage building(s) or inside the collector's vehicle, to enable the individual to view the collection, which is valued highly. Digitally they are kept on the device(s) the individual has on their person the most, or a device only they know the password to. Many traders and collectors of child sexual abuse material will ensure their collection, or at least part of their collection, is in a location they have frequent or easy access to and maintain "eyes on" the collection at all times. In your affiant's training and experience, collectors of child sexual abuse material will either have a location in their residence, in their personal vehicles, or at work, where they maintain their non-cloud-

based collection.

e.　　Individuals who receive or produce child sexual abuse material also may correspond with and/or meet others to share or trade information and materials. They rarely destroy correspondence from other child sexual abuse material distributors/ collectors. They conceal such correspondence as they do their sexually explicit material. They often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child sexual abuse material. Sometimes these lists are kept physically, but in more and more cases, the lists are maintained on a mobile or electronic device, or within an application or web-based program (like a friends list on a social media application).

f.　　Individuals who receive or produce child sexual abuse material also can, and will, maintain a separate mobile device for their collection, storage, and correspondence regarding child sexual abuse material.  These devices are usually kept hidden from family members, partners, and co-workers, in locations either only the collector has access to, or location others have limited access to (for example, an outbuilding, workshop, file cabinet drawer, vehicle if each member of the family has their own, or locked safe).  These locations can also be storage locations for any external devices (mentioned above) that may contain a collection.

g.　　Individuals who receive or produce child sexual abuse material prefer not to be without their child sexual abuse material for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child sexual abuse material throughout the world.

h.　　Individuals who produce child pornography via the internet or in-person often engage in "grooming" with the minor child. Grooming "describe[s] a variety of behaviors that appear calculated to prepare a child for a future sexual relationship." *United States v. Fox*, 600 Fed. Appx. 414, 419 (6th Cir. 2015) (unpublished) (citations omitted). "The ultimate goal of grooming is the formation of an emotional connection with the child and the reduction of the child's inhibitions in order to prepare the child for sexual activity." *See Id.* Based on my training and experience, grooming often includes first forming a friendship with the child; showering the child with attention, compliments, pet names, and gifts; exchanging non-explicit pictures or videos; and then flirting, discussing sexual knowledge or experience, discussing sexual fantasies, exchanging sexually explicit pictures or videos, and planning in-person sexual activities. Computers and smartphones often contain evidence of grooming, because many of these conversations occur by text or instant messaging.

i.　　Also, persons who are willing to engage in the grooming of minor children for the purpose of creating visual depictions of the minor children, will place themselves in positions where they have frequent access to children that are of the desirable age / sex of the offender, or would be victimized because of the offender's access to the child / children.  Such positions include coaching, teaching, positions within the church, or

9

community activities.

j.      In my experience, many offenders who produce child pornography also use coercive tactics to achieve their end goals of creating or obtaining sexually-explicit content. These coercive tactics include manipulation, threats to the minor, and threats to the minor's parents. Again, computers and smartphones often contain evidence of these coercive tactics.

10.      I believe that Knezevich shares many of these characteristics because—as discussed in greater detail below—there is reason to believe Knezevich has produced sexually explicit images/videos of minors and has kept those visual depictions for years.  Knezevich also placed himself in a position to have access to minors on an ongoing basis.  Knezevich was extensively involved with the EKU and Model Laboratory School (Model) Aquatics programs since 2010 [Model Laboratory School is a K-12 school located on the campus of Eastern Kentucky University].  Knezevich has been the swim coach for Model, coaching the high school swim team.  Over the summer, Knezevich was a lifeguard and pool manager for The University Club at Arlington.  This facility is a private facility with a strong swim program.  In an article from September 22, 2022, published by EKU's Eastern Progress, Knezevich stated about coaching the swim team:  "It's a very minimal time commitment, but you can make a big impact on those kids."

**BACKGROUND ON COMPUTERS AND CHILD SEXUAL ABUSE MATERIAL**

11.      I have had both training and experience in the investigation of computer-related crimes.  Based on my training, experience, and knowledge, I know the following:

12.      Computers and digital technology have dramatically changed the way in which individuals interested in child sexual abuse material interact with each other.  Computers basically serve four functions in connection with child sexual abuse material:  production, communication, distribution, and possession/storage.

13.     In the past, technology for the transfer of child sexual abuse material images consisted of child pornographers' transferring printed photographs into a computer-readable format with a device known as a scanner.  Now, with the advent of digital cameras, when the photograph is taken it is saved as a digital file that can be directly transferred to a computer by simply connecting the camera to the computer.  In the last ten years, the resolution of pictures taken by digital cameras has increased dramatically, meaning the photos taken with digital cameras have become sharper and crisper.  Photos taken on a digital camera are either stored on a removable memory card in the camera, which store up to, or even over, 64 gigabytes of data, equivalent to hundreds of thousands of high-resolution photographs, or the camera is Bluetooth or Wi-Fi capable so the images can be transferred directly to another device, or directly into a social media account on the internet.  Video camcorders, which once recorded video onto tapes or mini-CDs, are now just video cameras that can save video footage in a digital format directly to a hard drive embedded in the camera, or onto a transferable media storage device like a SD card. Some video cameras now even have Bluetooth or Wi-Fi capabilities so they can transfer the image directly to another device, or directly into a social media account on the internet.  For the old camcorders, the video files can be easily transferred from the camcorder to a computer via a cable that comes with the camcorder.  Now, all smartphones come with a digital camera embedded into the device itself.  The resolution on some of the embedded cameras on smartphones can be of a higher resolution than portable digital cameras.  The digital camera embedded in a smartphone can save the image directly onto the device, into a specific folder on the device, to a third-party application installed on the smartphone, to a media storage card inserted into the smartphone, or the image can be directed to transmit to an external device via wireless or Bluetooth connectivity between the smartphone and the selected external device.

14.     A device known as a modem allows any computer to connect to another computer through a telephone, cable, or wireless connection (Wi-Fi).  Similarly, smartphones can connect to the internet via Wi-Fi or cellular data. Thus, electronic contact can be made to literally millions of computers around the world.  The ability to produce child sexual abuse material easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child sexual abuse material.  Child sexual abuse material can be transferred via electronic mail, through file transfer protocols (FTPs), through Peer-to Peer software, and through social media applications, to anyone with access to a computer, laptop, tablet, smartphone, and a modem.  Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging", "Direct Messaging", cloud-based messaging services, etc.), social media sites, free applications for smartphones and tablets, all with easy access to the Internet, the computer, laptop, tablet, and smartphone is a preferred method of production, distribution, and receipt of child sexual abuse materials.

15.     The computer's, laptop's, tablet's, and smartphone's ability to store images in digital form makes these devices themselves an ideal repository for child sexual abuse material. The size of the electronic storage media (commonly referred to as the hard drive) used in all forms of electronics has grown tremendously within the last several years.  These drives can store hundreds of thousands of images at very high resolution.  In addition, there are numerous options available for the storage of computer or digital files.  One, two, and even four-Terabyte external and internal hard drives are not uncommon in today's computers and laptops.  Other media storage devices include CDs, DVDs, "thumb," "jump," or "flash" drives, and external hard drives, which are very small devices that are plugged into a port on the computer,

smartphone, laptop, or tablet.  It is extremely easy for an individual to take a photo with a digital camera, upload that photo to a computer, smartphone, laptop, and tablet, and then copy it (or any other files on the device) to any one of those media storage devices. Media storage devices are constantly being made smaller and smaller in size, and also being made to look like everyday items, that they can easily be concealed and carried on an individual's person (like on a key ring, in a purse or wallet, or on a belt buckle).

16.     The Internet affords individuals several different venues for obtaining, viewing, and trading child sexual abuse material in a relatively secure and anonymous fashion, including the traditional "Web" and the "Dark Web" or Tor browsers.

17.     Individuals also use online resources to retrieve and store child sexual abuse material, including services offered by Internet Portals such as Yahoo!, Google, and Hotmail, among others, as well as third-party cloud-based storage applications like Dropbox and Vault. The online services allow a user to set up an account with a remote computing service that provides e-mail services, direct messaging, as well as electronic storage of computer files in any variety of formats.  A user can set up an online storage account from any computer with access to the Internet.  Even in cases where online storage is used, however, evidence of child sexual abuse material can be found on the user's computer, smartphone, laptop, tablet, or external media in most cases.  All smartphones now come with the option to have the phone's data systematically updated to a provider's cloud storage.  All iPhones can back up a phone's data to iCloud Storage and all Android phones can back up the phone's data to Google Cloud Storage. This automatic backup also can back up some third-party applications.  But most third-party applications, once installed on a mobile device, will keep the individual's contents on one of their own servers, located elsewhere. Some third-party applications allow for special storage on

13

the user's device through their application. While the third-party application can see there is data, the data is encrypted on the application's servers and can only be viewed on the user's device through a special portal or passcode.

18.     As is the case with most digital technology, communications by way of electronic device can be saved or stored on the device used for these purposes.  Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files.  Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others).  In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.  Such information is often maintained indefinitely until overwritten by other data.

## <u>PROBABLE CAUSE</u>

19.     This investigation began on September 5, 2023, when a student at Eastern Kentucky University (EKU) in Richmond, Kentucky discovered a black box under a metal radiator of the men's bathroom in the Whalin Complex (also known as the aviation building). The student kicked the radiator and the black box dislodged from the radiator.  The student believed the box to be a camera.  The student then told another student, his roommate.  This student went to the bathroom to look at the box.  Upon confirming the box was a hidden camera with magnets to hold the camera to the metal radiator, this student called Eastern Kentucky University Police.

20.     Officer Debra Necessary with the Eastern Kentucky Police Department responded to retrieve the camera. The black box was confirmed to be a camera with a micro-SD card inside.

14

Officer Necessary then took the camera and the SD card to the Kentucky State Police (KSP) Electronic Crimes Branch (ECB) Forensics Lab, located on the Eastern Kentucky University campus.

21.     Forensic examiners from the lab reviewed the contents of the SD card.  Sergeant Leslie Strong of KSP recovered a video of an unknown adult male placing the camera in the bathroom and adjusting the camera angle to capture the urinals.  After placing the camera, the male walked across the bathroom and stood in front of the urinal.  The attire of the male was consistent with that of a professor, and not a student.

22.     Detective Strong then reviewed the EKU Aviation page and located an image of a male that appeared to be the male seen in the video camera footage setting up the camera.  The male was wearing a name tag that said "Kyle." A Google search for "Kyle" and "EKU Aviation" returned the result "Kyle J Knezevich – Applied Engineering & Technology" with the title of Associate Professor.

23.     Social media searches for Kyle Knezevich returned a Facebook page and an X Account (formally known as Twitter). Both of these accounts had pictures of an adult male consistent with the pictures of "Kyle Knezevich" from the EKU Aviation pages. The accounts also contained pictures and links demonstrating Kyle Knezevich's association with the Model Laboratory School's Swim Team.  Sergeant Strong then shared her findings with Officer Necessary.

24.     The case was then assigned to Detectives Gina Smith and Derek Kirunchyk with the EKU Police Department.  Detective Kirunchyk was able to verify Kyle Knezevich was still an employee of EKU and had an office in the Aviation Building / Whalin Complex, directly across from the men's restroom where the camera was located.  At that point, Detective

15

Kirunchyk sought a state search warrant to search Knezevich's home and seize any electronic devices that could also contain evidence of Knezevich's voyeuristic activities.

25.     While Detective Kirunchyk was obtaining the search warrant, Detective Smith went to Knezevich's residence to interview him.  During the interview, Knezevich admitted to placing the video camera in the men's restroom and further stated he had done so for his own personal sexual gratification.  Detective Smith specifically asked Knezevich if any images of child sexual abuse material would be located on any of the electronic devices in his possession.  Knezevich denied being in possession of any child sexual abuse material.

26.     The search warrant for Knezevich's residence, 200 General Cleburne Drive, Richmond, Kentucky, the person of Knezevich, Knezevich's office located on EKU's campus, and all vehicles associated with Knezevich, was obtained and executed on September 6, 2023.  All of the electronics sought to be searched by this warrant were seized during this search and were taken to the KSP ECB lab on EKU's campus for forensic analysis.

27.     A review of the devices for further evidence of Knezevich's voyeuristic activity was conducted by Forensic Examiner Carol Smith.  During this examination, Forensic Examiner Smith located several videos depicting minor male children, one possibly under the age of 12 years old, using a urinal.  The videos appear to have been taken with a camera located on an individual's waist, most likely in a phone holder, with the video capturing the person to the right of the camera using a urinal.  In these videos, the persons captured were minor males.  The videos appear to have been captured with an iPhone 6 and had EXIF data indicating the videos were taken as far back as 2014-2016.  In pictures from Knezevich's Facebook and X accounts, dated 2019,  Knezevich is photographed with the Model Swim Team and can be seen wearing his cell phone in a waist / belt holster, which is consistent with the videos of CSAM recovered by

16

Forensic Examiner Smith.   Your Affiant has not seen the videos being described above but is relying on the description provided by Forensic Examiner Smith.

28.     The videos described above were recovered from an external hard drive.  Since the videos were created with an iPhone 6, but recovered on an external hard drive, the videos had to be transferred from the phone to the external hard drive.  It is common for possessors of CSAM to utilize an internet-based program to transfer the images from one device to another. In this instance, a program like Apple's iCloud could store the images from the phone and then the user can access the cloud from another device, such as a laptop or tower, attach the external hard drive to this device, then move the videos to this external hard drive. You affiant knows that the internet is a means or facility of interstate or foreign commerce.

29.     Since the original search warrant was for evidence of voyeurism, your affiant seeks this warrant to allow for a search of the devices specifically for the purpose of locating evidence related to the possession, production, and potential receipt or distribution of child sexual abuse material.

30.     The discovery of CSAM on the devices belonging to Knezevich leads your Affiant to believe that evidence of violations of 18 U.S.C. §§ 2251(a) and 2252(a)(4)(B) exists on those devices.  Your affiant requests permission to search all of the electronic devices seized from Knezevich's home because the evidence indicates that he produced images using one type of electronic device and would use others to store those images. Moreover, as discussed above, persons with an interest in child sexual abuse material and people that produce and possess CSAM are likely to have CSAM on multiple electronic devices.

### COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

31.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the Devices, in whatever form they are found.  One form in which the records might be found is data stored on a computer's, thumb drive's, or smartphone's storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

32.     *Probable cause.*  I submit there is reason to believe the records listed in Attachment B will be stored on the Devices for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer/smartphone[1] files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer or smartphone's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, computer storage media contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.     Similarly, files that have been viewed via the Internet / cellular connection are sometimes automatically downloaded into a temporary Internet directory or "cache."

---

[1] Because a smartphone is, in part, a handheld computer, this portion of the affidavit will use the terms "computer" and "smartphone" interchangeably.

33.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronic files or data that might serve as direct evidence of the crimes described in the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on the Devices because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified for nefarious reasons by a subject.

b.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation

19

information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

       c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

       d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

       e.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

       34.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

35.     *Manner of execution.*  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

36.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.


Respectfully submitted,



/s/ Kimberly Hill Kidd
Special Agent Kimberly Hill Kidd
Federal Bureau of Investigation



Attested to by applicant by reliable electronic means per FRCrP 4.1 on this 11th day of September, 2023.



Hon. Matthew A. Stinnett
UNITED STATES MAGISTRATE JUDGE


21